Filed 12/10/20

# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B295128 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA142561) |
| v. | |
| DAMON LAMAR BOOKER et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Sean D. Coen, Judge. Affirmed in part; reversed in part and remanded with directions.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant Damon Lamar Booker.

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant George Lewis.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

---

* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts B-H of the Discussion.

Attorney General, Paul M. Roadarmel, Jr., and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

Codefendants Damon Lamar Booker and George Lewis appeal from judgments of conviction entered after a jury trial for first degree murder; attempted willful, deliberate, and premeditated murder; and shooting at an occupied vehicle. The jury found true the special allegations Booker personally used a firearm causing great bodily injury or death in the commission of the offenses and the offenses were committed for the benefit of a criminal street gang.

In the published part of the opinion we address Booker's and Lewis's contentions the trial court prejudicially erred in instructing the jury on the "kill zone" theory of concurrent specific intent to prove the attempted murder in light of the Supreme Court's holding in *People v. Canizales* (2019) 7 Cal.5th 591, 596-597 (*Canizales*) that "a jury may convict a defendant under the kill zone theory only when the jury finds that: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." We agree with Booker and Lewis this is not one of the "relatively few cases in which the [kill zone] theory will be applicable and an instruction

2

appropriate." (*Id.* at p. 608.)  It was prejudicial error for the trial court to instruct the jury on the kill zone theory.

In the unpublished portion of the opinion we address Booker's and Lewis's arguments the trial court erred in failing to instruct the jury certain trial witnesses were accomplices as a matter of law; there is insufficient evidence to corroborate the testimony of those witnesses; the court erred in failing to hold a hearing on juror misconduct; and remand is necessary for the trial court to exercise its discretion whether to strike the firearm enhancements.  We also consider Booker's assertion his trial counsel provided ineffective assistance of counsel and Lewis's argument the trial court committed instructional error.  These contentions lack merit.

We reverse Booker's and Lewis's convictions of attempted murder and remand for further proceedings consistent with this opinion.  In all other respects we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Information*

An information charged Booker and Lewis, along with codefendants William Weaver, Marcus Posey, and Jeremiah Stone, with the first degree murder of Jose Raya (Pen. Code,[1] § 187, subd. (a); count 1); the attempted willful, deliberate, and premeditated murder of Reann Lott (§§ 187, subd. (a), 664; count 2); and shooting at an occupied vehicle (§ 246; count 3).  As to all counts, the information alleged the defendants committed the offenses for the benefit of, at the direction of, or in association

---

[1]    All undesignated statutory references are to the Penal Code.

3

with a criminal street gang (§ 186.22, subd. (b)); Booker or a principal personally used a firearm (§ 12022.53, subds. (b) & (e)(1)); Booker or a principal personally and intentionally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)); and Booker or a principal personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (d) & (e)(1)).

Booker and Lewis pleaded not guilty and denied the special allegations.  Before trial all defendants moved to dismiss the charges against them pursuant to section 995.  The trial court granted the motions by Weaver, Stone, and Posey, but denied the motions by Booker and Lewis.

An amended information additionally alleged as to each count both Booker and Lewis suffered two prior convictions of serious or violent felonies, which constituted strikes within the meaning of the three strikes law (§§ 667, subds. (b)-(j), 1170.12).

B.     *The Evidence at Trial*
       1.     *The People's case*
              a.     The shooting
Lott testified she was with her boyfriend Raya on the evening of December 17, 2016.  Lott and Raya drove in Lott's car, a white Pontiac Grand Prix, to a liquor store to buy beer.  As Lott walked to the entrance of the liquor store, she noticed a white car with tinted windows parked in a lot on the side of the building.  Lott thought the back end of the white car and its lights resembled her own car.  As other cars drove by, their lights illuminated the inside of the white car, and Lott saw "there [were] a lot of people in the car."

4

Inside the liquor store, Raya saw a friend near the counter and started talking with him. Lott left Raya with his friend and walked into another aisle to get the beer.

Booker, Lewis, Weaver, Stone, and Posey entered the store together, then separated and moved throughout the store.[2] As the men spoke to one another, Lott heard the men used the word "cuzz," which Lott recognized as slang commonly used by members of Crips street gangs. The men were staring at Raya and his friend. Lott felt tension in the air.

Raya's friend asked the men where they were from. One of the men answered "Fruit Town," to which Raya's friend responded he "was cool with them." Raya did not speak to the men, nor did they speak to Raya. Raya was not a member of any gang. Shortly thereafter, the five men left together without buying anything.

When Raya and Lott left the store, the white car with tinted windows was no longer parked in the lot. The two returned to Lott's car. Raya drove, and Lott was in the front passenger seat. They drove down 130th Street toward Lott's home. Raya told Lott the man he was speaking with in the store was a friend and a member of the Largo street gang. Lott then noticed a white car following closely behind their car on 130th Street. The white car was "riding" their bumper. Lott said to Raya, "[T]hey look like they're about to hit us." Raya stopped at a stop sign or stop light. The white car pulled up next to Lott's car on the driver's side "within seconds" of Raya stopping the car. Lott recognized the car was the same white car from outside the liquor store. Raya told Lott to duck down, which she did. As she

---

[2]    Lott identified the five men after viewing surveillance video footage taken inside the liquor store.

ducked, Lott saw a hand emerge from the front passenger window of the white car, and she heard five shots fired at their car. Lott was not hit. The white car then drove in reverse. A black car in front of them also "drove off." Lott could not recall whether the black car drove forward or in reverse after the shooting. Lott did not remember whether there was a third car. After the shooting, Lott's car rolled forward then stopped when Raya "smashed on the brakes."

At around 6:43 that evening, Los Angeles County Sherriff's Department (LASD) Deputy David Navarrete heard the sound of gunshots while on patrol and responded to the scene of the shooting. While traveling northbound on Wilmington Avenue from 131st Street, Deputy Navarrete observed a white Grand Prix stopped in the middle of the road blocking traffic. Deputy Navarrete saw a man in the driver's seat of the car slumped over and bleeding from his head. Paramedics on the scene determined Raya was dead. The driver's side front window of the Grand Prix was shattered, but there was no damage to any other windows. No bullet holes were found on the car's body or doors. Deputy Navarette estimated it would take one minute to drive from the liquor store to the scene of the shooting on 130th Street.

LASD Detective Kasey Woodruff also responded to the scene of the shooting on the evening of December 17. Detective Woodruff obtained surveillance footage from a video camera mounted inside the liquor store and two video cameras hung outside Greater Zion Church, located at the corner of 130th Street and Wilmington Avenue. Surveillance video of the interior

of the liquor store taken the night of the shooting showed Booker, Lewis, Weaver, Stone, and Posey in the store.[3]

At approximately 6:40 p.m. on December 17, Frederick Gordon, an elder in the Greater Zion Church, was inside the church when he heard "pops" outside that sounded like gunfire. He went outside to check and saw "a car backing up from 130th." One of the church surveillance videos showed a white car driving down 130th Street, followed by two more white cars, and then a black car. The video then showed the black car driving in reverse, followed by a white car also driving in reverse, returning the way they came. Another church surveillance video from the same time period showed a white car driving down 130th Street toward Wilmington Avenue. When the white car stopped at the intersection of Wilmington Avenue, a second white car maneuvered around to the driver's side of the first car. A third white car approached the two cars from behind, and then drove in reverse back the way it came.

Forensic pathologist Scott Luzi testified Raya was shot once in his left arm above the elbow and twice in his head near his left ear. Dr. Luzi determined Raya died from multiple gunshot wounds to the head. Raya's injuries were consistent with Raya having raised his left arm to the same level as his head at the time he was shot.

---

[3]      LASD Sergeant John Ganarial reviewed still images taken from the liquor store interior surveillance video and identified Booker and Lewis. Deputy Orlando Saldana reviewed the same surveillance video and identified Booker, Lewis, Posey, Stone, and Weaver.

> b. The initial arrest of Booker and search of his vehicle

Los Angeles Police Officer Oscar Morales was on patrol on the evening of January 4, 2017. He observed two Black males running and then entering a four-door white Oldsmobile Intrigue with tinted windows. Officer Morales made a U-turn to follow the white car, which then crossed four lanes of traffic without signaling. Officer Morales activated his patrol car's lights and sirens to effectuate a stop, but the white car accelerated. Officer Morales followed the car until it struck a fence. The driver (Booker) exited the vehicle, slipped through the fence, and began to run down an alley. Officer Morales caught up with Booker and arrested him. Detective Woodruff searched the car after it was impounded and recovered a wallet containing Booker's name and photograph from the inside panel of the driver's side door and a document with Booker's name inside the center console. The car was tested for gunshot residue, but none was found.

> c. The arrests and interviews of Booker, Weaver, Posey, Stone, and Lewis

On February 16, 2017 sheriff's deputies arrested Booker (following his earlier release), Weaver, and Posey for Raya's murder. In his recorded interview with Detectives Woodruff and Karen Shonka, Weaver admitted he was a member of the Poccet Hood Compton Crips street gang[4] "since [he] was young." Detective Woodruff informed Weaver there was a warrant for his arrest for murder and asked him whether anything happened

---

[4] The Poccet Hood Compton Crips street gang is also known as "Corner Poccet" or simply "Poccet Hood." For the sake of brevity, we generally refer to the gang as "Poccet Hood."

with Booker, Lewis, and other Poccet Hood gang members on December 17, 2016 at 6:40 p.m. Weaver did not answer. When he was shown a still image from the liquor store's surveillance video, Weaver admitted visiting the liquor store on December 17. Weaver acknowledged four other Poccet Hood gang members were in the liquor store as well. Weaver said he left without buying anything. He then drove to a second liquor store with his brother in Weaver's white Buick Regal, which Weaver volunteered had "no tint." Weaver denied any knowledge of Raya's killing.[5]

The same day Detectives Woodruff and Shonka interviewed Posey. Posey admitted he had been a member of Poccet Hood, but he claimed he had "been out for years." Posey admitted knowing Booker, Lewis, Weaver, and Stone. Posey initially denied involvement with Raya's murder. But when he was shown a still image from the liquor store's surveillance video, Posey stated, "That's me," and he admitted visiting the liquor store on December 17 to buy alcohol. Posey had gone to the liquor store with Stone in Stone's car, which Posey believed was a black Infiniti. Posey stated, "I ain't got shit to do with anything. That's what's so fucked up." According to Posey, after he and Stone left the liquor store, they headed home. Detective Shonka interjected, "But what changed it? Something changed it, right?" Posey responded, "Me not being behind the driving wheel, that's what changed." Detective Shonka asked, "[Stone] did what? What did he do?" Posey replied, "He didn't go home . . . ."

---

[5] Audio recordings of the interviews of Weaver and Lewis and video recordings of the interviews of Posey and Stone were admitted into evidence and played for the jury.

Posey then made a phone call to his girlfriend from the interview room. After speaking with her, Posey explained to the detectives he and Stone left the liquor store together "in the black car" and "turned down 130th." They drove behind Weaver, who drove alone in his white car. Booker and Lewis were in front of Weaver in Booker's white car, which Posey thought was a Grand Am. Lewis was driving, and Booker was in the front passenger seat. Posey heard multiple gunshots and saw a flash coming from the passenger side of Booker's car. Posey explained, "[I]t [was] just out of nowhere . . . ." After the shooting, Booker and Lewis "pulled off" and drove south. Weaver reversed and drove off. Stone and Posey also backed up, then made a U-turn and headed home. Posey denied the shooting was discussed or planned in advance. On the night of the shooting, Posey did not see a gun or know that anyone had a gun. Posey denied speaking with Booker, Lewis, Stone, or Weaver about what happened. At some point, Booker called Posey and said, "I want to talk to you," but the two never discussed the shooting.

On February 17, 2017 Booker called an unidentified woman from jail in a recorded call. Booker told her he had been charged with murder. He added, "I think I'm going to get out. Even if I gotta take 15 to 20." Booker mentioned that Posey, Stone, and Weaver were also in jail. The woman asked, "So, you was with them, supposedly, in December?" Booker responded, "[I]t's a whole bunch of . . . bullshit. And then they—they talking about looking for somebody I don't know."

Stone was arrested on March 1, 2017. When he was arrested, a black Lexus sedan was in the driveway, photographs of which were introduced into evidence. In his recorded interview with Detective Woodruff, Stone admitted he knew Booker, Lewis, Weaver, and Posey. On the evening of the shooting, Stone had

10

driven Posey to the liquor store in Stone's black Lexus "to get some blunts." When the two arrived at the liquor store, Weaver, Booker, and Lewis were already inside. Stone and Posey left the liquor store without purchasing anything, and they returned to a party for the great-grandmother of Posey's child. Stone identified Booker and Lewis entering the liquor store in a still image from the liquor store's surveillance video. Stone denied being a member of Poccet Hood or any other street gang. He also denied knowing about the murder of Raya and stated, "I didn't see anybody get shot." But Stone admitted he heard "a gun pop" after returning to the party.

Lewis was arrested in Las Vegas on March 23, 2017 for a parole violation. In his recorded interview with Detectives Woodruff and Shonka, Lewis admitted he knew Booker, Weaver, Stone, and Posey, and each of the four were members of Poccet Hood. Lewis initially denied he was a member of Poccet Hood, but he admitted it when the detectives pointed out his tattoo, which read "Poccet Hood." Lewis said he was in Compton in "the beginning of December" to meet with his parole officer, but he returned to Las Vegas by the day of the shooting. When he was shown a still image from the liquor store surveillance footage, Lewis denied he was pictured or present in the liquor store on December 17, 2016. Lewis also denied speaking to Booker, Weaver, Stone, or Posey on that day.

### d. Posey's proffer interview

On January 18, 2018 Deputy District Attorney Brian Kang and Detective Woodruff interviewed Posey.[6] Posey admitted he

---

[6] At the outset of the interview, Kang presented Posey with a proffer agreement, which Posey signed.

was a member of Poccet Hood with the monikers "Tiny Dog" and "Peanut." According to Posey, Largo is one of the main rivals of Poccet Hood. Posey knew Booker, Weaver, Lewis, and Stone for many years. About 5:00 on the night of the shooting, Posey was at his grandmother's house with his family celebrating his grandmother's birthday when Stone stopped by in his black Lexus. Posey got into Stone's car to go to the liquor store to get alcohol. On their way Weaver pulled up by himself in his white car.[7] Weaver followed Stone's car, and then Booker and Lewis pulled up in a white car, which Booker was driving. Posey and Stone told Booker and Lewis they were heading to the liquor store. The three cars then went together to the liquor store. Stone, Weaver, and Booker parked their vehicles near the liquor store. Posey did not see Raya and Lott park or enter the store.

The liquor store was located on the border of Poccet Hood and Largo territory. Posey entered the store after the other four men. When Posey entered the store, he went down an aisle toward the back of the store while Booker, Weaver, and Lewis went toward the cash register where "the guy banged on them or whatever." Posey heard "one of those guys" say, "Where you from?" Posey did not hear Booker, Lewis, Weaver, or Stone say anything. According to Posey, no one said "Fruit Town." Posey tried to avoid the "commotion" by going to the back of the store.

Weaver exited the store, and Posey and Stone followed without purchasing anything. Posey and Stone got in Stone's car; Weaver into his car; and Booker and Lewis into Booker's car, with Booker in the driver's seat. Stone and Posey sat "for a second" in the car and waited for Weaver to pull out. Detective

---

[7]     Posey described Weaver's car as a white "Oldsmobile Cutlass" or "Century."

Woodruff asked, "Were . . . you and [Stone] planning on following Weaver and Lewis and Booker somewhere?" Posey responded, "Not really. I wasn't driving, so I didn't have full control of the steering wheel, so, no." Weaver pulled out, and Stone followed. They turned on 130th Street, where Booker had pulled his car over. Weaver pulled over, as did Stone. No one spoke. Lewis and Booker switched seats, with Lewis now in the driver's seat. Lewis also took off his gray sweatshirt and gave it to Booker, who put it on. According to Posey, a gang member would switch clothing with another "[t]o cover [his] self." While this was happening, a white car, like a Pontiac Grand Am, passed by the three pulled-over cars. Posey did not see the occupants of the passing vehicle.

After the white car passed, all three cars followed it down 130th Street, first Lewis, then Weaver, then Stone. At the intersection of 130th Street and Wilmington Avenue, Booker stuck his arm out of the window and "started shooting . . . into the white car." Posey heard five to seven shots. Weaver and Stone drove in reverse, and Lewis and Booker turned left and drove south. Stone dropped Posey off at Posey's grandmother's house and left.

Booker later called Posey and said, "You know, we need to talk." Posey responded, "Shit. For what?" Booker called Posey "a couple times" after that, but they did not speak again. Posey later spoke with Lewis, but only about music. Posey spoke with Weaver often, but the two only discussed the shooting once, when Posey asked about it and Weaver responded, "I don't know, bro."

Detective Woodruff asked, "Do you know where the gun went?" Posey responded, "No, I don't. I didn't have—never had nothing to do with the gun, never none of it . . . ." Detective Woodruff inquired, "Have you ever seen that where someone's

13

gonna go do a mission, and there's . . . a primary vehicle and a following vehicle and maybe another follow vehicle?" Posey responded, "[N]ot really. I mean, if you gonna shoot someone, you really want to be by yourself." Posey added, "That's just nothing but a lot of people watching you."

      e.     Telephone calls

Between 6:00 and 7:10 on the evening of the shooting, five calls were made between Weaver and Posey; Weaver and Lewis; Booker and Weaver; Booker and Stone; and Stone and Lewis. Booker called Lewis at 6:49 and 6:51 p.m., and Lewis called Booker at 6:58 p.m. Posey sent a text message to Booker at 7:58 p.m. At 8:03 p.m. Booker called Posey.

      f.     Trial testimony of Weaver, Stone, and Posey

Although Weaver initially invoked his Fifth Amendment right against self-incrimination, he testified after the prosecution offered him use immunity. However, he responded to all the prosecutor's questions with "I don't know," "I don't remember," or "I plead the 5th."

Stone also testified after he was offered use immunity. Stone denied membership in or knowledge of the Poccet Hood street gang. When the prosecutor asked Stone about the liquor store incident, Stone repeatedly responded, "I can't recall, sir." The prosecutor played a music video purporting to show Stone, Booker, and Lewis singing lyrics including, "I'm out the Poccet," "Bitch I'm out thuggin', I be riding on the suckas," "It's killing

14

season, O bitch," and "If the situation funny, best believe that I'm a bust."[8]  Stone denied he was in the video.

In his testimony, Posey denied being a member of Poccet Hood or any other gang.  But he admitted Poccet Hood was a "Compton Crip gang" and he had "Crip" tattooed on his back and a "P" and an "H" tattooed on each hand, the initials for Poccet Hood.  Posey answered "I don't remember" to every question the prosecutor asked regarding the night of December 17, 2016; his relationship to Booker, Lewis, Weaver, and Stone; and his subsequent arrest and interviews.  Posey denied killing Raya.

g.  Gang evidence

Sergeant John Ganarial worked in the LASD gang unit on and off during the period from 2000 to 2013, and he was familiar with the Poccet Hood gang.  Sergeant Ganarial had personal contact with Booker and was familiar with Lewis, Weaver, and Posey.  He opined the four were documented members of the Poccet Hood gang.  As to Stone, Sergeant Ganarial described his family as "very influential" within the Poccet Hood gang.  Los Angeles Police Officer Oscar Medina testified he initiated a traffic stop on September 28, 2016 on a white Buick that Weaver was driving.  Weaver told Officer Medina he was from Poccet Hood and went by the moniker "Ill Will."  Weaver had the word "Illest" tattooed on his back and "P" and "H" tattooed on his hands.

LASD Deputy Orlando Saldana, a gang investigator for the Compton sheriff's station, was familiar with the Poccet Hood street gang.  The Largo 36 street gang is a rival of Poccet Hood, but Largo 36 did not have a feud with the Fruit Town gang.  The

---

[8]  The music video and a transcript of the video's lyrics were admitted into evidence.

liquor store sits on the border of Poccet Hood and Largo territory. Deputy Saldana opined Booker, Lewis, Weaver, and Posey were Poccet Hood gang members, relying in part on photographs of gang symbols tattooed on each of the men and photographs depicting Booker, Lewis, and Weaver together flashing Poccet Hood gang signs. In response to a hypothetical based on the facts of the case, Deputy Saldana opined the shooting was committed for the benefit of or in association with the Poccet Hood Compton Crips street gang. Deputy Saldana reasoned that under the hypothetical, the gang members worked in association with one another to "get a better, more clear shot" by pulling up next to the victims' vehicle.

2.    *Lewis's case*[9]

Lewis testified he never lived in Poccet Hood territory but began associating with the gang during high school. Lewis admitted he was a member of the gang and the liquor store was "in the hood." On the day of the shooting, Lewis traveled to California from Las Vegas, where he was living, to see his parole officer. Earlier in the evening he "was hanging out" with Booker, Weaver, Stone, and Posey. The five men went to the liquor store, but Lewis drove his own car, a burgundy Impala. Booker, Stone, and Weaver drove their own cars and followed each other to the store. Lewis parked on the street. The men did not "hang out" outside the liquor store before they entered the store. Lewis did not remember hearing anyone in the liquor store say "[w]here you from."

---

[9]    Booker did not testify or call any witnesses.

16

When Lewis left, he did not talk to his friends, and he drove by himself to the house of the father of his sister's child. Lewis did not hear any gunshots. But he admitted speaking separately with Booker, Weaver, and Stone by phone "within minutes" after the shooting. Lewis returned to Las Vegas after staying two days in California.

3. *The People's rebuttal*

Phone records showed Lewis arrived in the Los Angeles area on the evening of December 16, 2016, and he returned to Las Vegas on December 18. The records also showed Lewis's phone was in the general area of the shooting at 6:43 p.m. on December 17.

C. *The Verdict and Sentencing*

The jury found Booker and Lewis guilty on count 1 of first degree murder; on count 2 of attempted willful, deliberate, and premeditated murder; and on count 3 of shooting at an occupied vehicle. The jury also found true all the special allegations. After a bifurcated trial, the trial court found true the prior conviction allegations against Booker and Lewis.

The court sentenced Booker and Lewis to aggregate terms of 170 years to life in state prison. As to count 1, the trial court imposed sentences of 25 years to life, tripled to 75 years to life under the three strikes law (§ 667, subd. (e)(2)(A)(i)). The court imposed consecutive sentences of 25 years to life on count 2 under the three strikes law (§ 667, subd. (e)(2)(A)(ii)). The court imposed on counts 1 and 2 additional terms of 25 years to life for the firearm enhancement (§§ 12022.53, subd. (d) [Booker], 12022.53, subds. (d) & (e)(1) [Lewis]) and 10 years under section 667, subd. (a)(1) (two 5-year terms). The court imposed and

stayed sentences of 60 years to life on count 3 pursuant to section 654.[10]

Booker and Lewis timely appealed.

## DISCUSSION

A.    *The Trial Court Erred in Instructing on the Kill Zone Theory of Concurrent Intent To Kill*

1.    *Jury instructions and closing argument*

The trial court instructed the jury with CALJIC No. 8.66, "In order to prove attempted murder, each of the following elements must be proved:  [¶]  1. A direct but ineffectual act was done by one person towards killing another human being; and  [¶] 2. The person committing the act harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being."  The court further instructed the jury with a modified version of CALJIC No. 8.66.1, "A person who primarily intends to kill one person or persons known as the primary target may at the same time attempt to kill all persons in the immediate vicinity of the primary target.  The perpetrator specifically intending to kill the primary target by lethal means may also attempt to kill everyone in the immediate vicinity of the primary target.  If the perpetrator has this specific intent and

---

[10]    The trial court imposed and stayed the additional firearm enhancements charged as to Booker and Lewis.  The court appears to have also imposed a 15-year minimum parole eligibility date for the gang enhancement under section 186.22, subdivision (b)(5), while noting the enhancement would have no effect on the sentence.  However, the abstracts of judgment do not reflect imposition of the gang enhancement.

18

employs the means sufficient to kill the primary target and all others in the immediate vicinity of the primary target, the perpetrator is guilty of the crime of attempted murder of the other persons in the immediate vicinity.  [¶]  Whether a perpetrator actually intended to kill the victim either as a primary target or as someone within the immediate vicinity is an issue to be decided by you."

During his closing argument the prosecutor explained the kill zone theory:  "They're guilty of attempted murder if they intended to kill Reann Lott.  But they're also guilty of it if they intended to kill—not necessarily car[ing] about who it was exactly.  But if they tried to kill everyone in the immediate vicinity of the primary target.  Does everyone understand that?  That the intent to kill—there was intent to kill the person.  But there's also an intent to kill if that person is intending to kill all the people in that immediate vicinity based on what you see, based on the number of the shooting and the bullets and the way it was conducted."

### 2. *The kill zone theory of concurrent intent to kill*

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*Canizales, supra*, 7 Cal.5th at p. 602; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 890; *People v. Perez* (2010) 50 Cal.4th 222, 224 ["[S]hooting at a person or persons and thereby endangering their lives does not itself establish the requisite intent for the crime of attempted murder."].)  "[A]n intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine."

19

(*Canizales*, at p. 602; accord, *People v. Bland* (2002) 28 Cal.4th 313, 327-328 (*Bland*).)

In *Bland, supra*, 28 Cal.4th at pages 329-330, the Supreme Court first articulated the kill zone theory of attempted murder, explaining, "'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. . . . Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.'" As examples of appropriate applications of the kill zone theory, the *Bland* court described a defendant placing a bomb on a commercial plane intending to harm a primary target on the plane by killing all the passengers and an assailant attacking a group of people by using "'automatic weapon fire or an explosive device devastating enough to kill everyone in the group.'" (*Id.* at p. 330.) The Court described these scenarios as those where "'[t]he defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.'" (*Ibid.*) The *Bland* court concluded that where the defendant and a second shooter fired a "flurry of bullets at the fleeing car" in order to kill the driver, injuring two passengers, the evidence "virtually compels" an inference the defendant created a kill zone that would support attempted murder convictions as to both passengers. (*Id.* at pp. 330-331, 333.)

The Supreme Court in *People v. Perez, supra*, 50 Cal.4th at page 232 again considered the kill zone theory and found the

20

defendant had not created a kill zone by firing a single shot from a moving car at a group of eight individuals 60 feet away, therefore supporting only one, not eight, counts of attempted murder. The *Perez* court explained, "'[A] shooter may be convicted of multiple counts of attempted murder on a "kill zone" theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the "kill zone") as the means of accomplishing the killing of that victim.'" (*Ibid.*; see *People v. Stone* (2009) 46 Cal.4th 131, 135 [trial court erred by instructing on kill zone theory where defendant shot a single bullet at alleged victim standing in group of 10 rival gang members 60 feet away from defendant].)

The Supreme Court revisited the kill zone theory in *Canizales, supra*, 7 Cal.5th 591, in which it narrowed application of the doctrine. (*In re Rayford* (2020) 50 Cal.App.5th 754, 769 (*Rayford*).) The Supreme Court held, "[T]he kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm. [¶] In determining the defendant's intent to create a zone of fatal

21

harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target.  Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Canizales, supra*, 7 Cal.5th at p. 607.)

In so holding, the Supreme Court in *Canizales* cautioned, "[W]e anticipate there will be relatively few cases in which the theory will be applicable and an instruction appropriate.  Trial courts should tread carefully when the prosecution proposes to rely on such a theory, and should provide an instruction to the jury only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm.  The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction."  (*Canizales, supra*, 7 Cal.5th at p. 608.)

As we explained in *Rayford, supra*, 50 Cal.App.5th at pages 769 to 770, "Although the defendants in *Canizales* fired five shots from a semiautomatic nine-millimeter gun at a group that included a rival gang member (Denzell Pride) with whom one of the defendants had engaged in a verbal altercation earlier that day, the defendants were not 'in close proximity to the area surrounding their intended target,' but instead were positioned 100 to 160 feet away from a block party on a wide city street, and the bullets were "'going everywhere'" as Pride and fellow gang member Travion Bolden ran away after the first shot was fired.

22

(*Canizales, supra*, 7 Cal.5th at pp. 610-611.) The *Canizales* court concluded the evidence was not sufficient to allow the jury to find the defendants intended to create a zone of fatal harm around Pride, and it reversed the defendants' convictions of the attempted murder of Bolden. (*Id*. at pp. 611, 615.) The Supreme Court distinguished these facts from those in other cases in which 'the defendants opened fire while in close proximity to the area surrounding their intended target.' (*Id*. at pp. 610-611; see *Bland, supra*, 28 Cal.4th at p. 318 [defendant fired flurry of bullets directly into vehicle]; *People v. Vang* (2001) 87 Cal.App.4th 554, 564 [defendants sprayed 50 or more bullets from high-powered, 'wall-piercing' weapons at two separate apartment buildings]; *Washington v. U.S.* (D.C. 2015) 111 A.3d 16, 24 [defendant fired 10 shots at four people standing in close proximity to each other and 21 feet from defendant, hitting three of the group].)"

> 3. *Under* Canizales*, the evidence at trial was not sufficient to instruct the jury on the kill zone theory*

Booker and Lewis contend under *Canizales* the circumstances of the shooting did not support the trial court instructing the jury on the kill zone theory.[11] Rather, they assert

---

[11] The People contend Booker and Lewis forfeited their claim of error because they failed in the trial court to object or request an alternative instruction. But we review any claim of instructional error that affects a defendant's substantial rights whether or not trial counsel objected. (§ 1259 ["The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the [trial] court, if the substantial rights of the defendant were affected thereby."];

23

the only reasonable inference supported by the evidence is that "the gunman was close to Raya and killed him by firing directly into him from point blank range." Thus, there was not sufficient evidence defendants intended to kill Raya by killing everyone in the zone of fatal harm around Raya, including Lott. We agree.

The People argue the circumstances of the shooting here support a reasonable inference Booker intended to kill everyone in the zone of fatal harm around Raya "in the confined location of [the] car's cabin" because, unlike in *Canizales*, Lewis and Booker pulled their car alongside Lott's car in close proximity to Raya and Lott, and Lott was seated next to Raya in the "direct line of fire of the shots." Thus, under *Canizales* two of the circumstances to support the kill zone theory are present here— the distance between the defendant and the alleged victim and the proximity of the alleged victim to the primary target. (*Canizales*, *supra*, 7 Cal.5th at pp. 597, 607.)

However, as the *Canizales* court explained, "[T]he kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.'" (*Canizales, supra*, 7 Cal.5th at p. 607, quoting *People v. Medina*

_____

*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012 [failure to object to instruction does not forfeit issue on appeal when alleged error concerns elements of offense]; *People v. Gutierrez* (2018) 20 Cal.App.5th 847, 856, fn. 8 ["[W]hen an instruction allegedly affects the substantial rights of the defendant, it is reviewable even in the absence of an objection."].)

(2019) 33 Cal.App.5th 146, 156.) Here, the type and extent of force used do not support a reasonable inference Booker and Lewis intended to kill Raya by killing everyone in the car's cabin. At most, the evidence supports a reasonable inference Booker and Lewis acted with conscious disregard of the risk Lott might be seriously injured or killed. In contrast to *Bland, supra*, 28 Cal.4th at pages 330-331, in which two shooters fired a "flurry of bullets at the fleeing car," Booker as sole shooter fired a total of three to seven shots[12] directed at the front driver's side of Lott's stationary car. Further, Booker's shots were directed at Raya at close range, striking him twice in his head and once in his arm in a manner consistent with Raya defensively raising his left arm during the shooting. The driver's side front window of Lott's car was shattered, but there were no bullet holes in the car's body or doors that would have reflected a spray of bullets. Nor was there evidence any bullets reached the front passenger side of the car where Lott was sitting, and Lott was not injured. Although the determination whether to instruct on the kill zone "does not turn on the effectiveness or ineffectiveness of the defendant's chosen method of attack," whether an inference can reasonably be drawn "is at least informed by evidence" Lott (like Bolden in *Canizales*) was not hit by any of the bullets. (*Canizales, supra*, 7 Cal.5th at p. 611.) And finally, there was no evidence suggesting Booker used a rapid-firing semiautomatic or automatic weapon.

By contrast, in the only published case since *Canizales* to find the evidence supported a kill zone instruction, *People v.*

---

[12] Although Lott testified she heard around five gunshots and Posey testified he heard between five and seven gunshots, the People presented physical evidence of only three bullets, those which struck Raya.

25

*Cerda* (2020) 45 Cal.App.5th 1, 16-17, review granted May 13, 2020, S260915, the shooter used an assault rifle to fire "up to four times the velocity of handgun ammunition" into two houses, firing at least 16 shots at one house and multiple shots at a second house.  (See *People v. Vang, supra*, 87 Cal.App.4th at pp. 558, 564; cf. *People v. Cardenas* (2020) 53 Cal.App.5th 102, 114-115 [insufficient evidence supported kill zone instruction where first two bullets were fired at primary target with alleged attempted murder victim standing one car's length behind primary target, and second round of bullets were fired as shooters retreated]; *Rayford, supra,* 50 Cal.App.5th at pp. 779-781 [trial court prejudicially erred in giving kill zone instruction where three shooters fired a total of eight bullets across the front of the house, injuring two of 11 people gathered inside or in front of the house]; *People v. Thompkins* (2020) 50 Cal.App.5th 365, 377-379, 394-396 [trial court prejudicially erred in giving kill zone instruction where shooter fired 10 shots into crowd of 10 to 20 customers in a restaurant, killing two and wounding five people, with no evidence of an intended target]; *People v. Mariscal* (2020) 47 Cal.App.5th 129, 139 (*Mariscal*) [trial court erred in giving kill zone instruction where defendant shot at four of the primary target's friends after killing the primary target, but the error was harmless beyond a reasonable doubt].)  Under the circumstances here, the trial court erred in instructing the jury on the kill zone theory.

### 4.  *The error was prejudicial*

"When an erroneous instruction is given, the standard of review turns on whether the instruction was merely factually unsupported or instead legally erroneous." (*Mariscal, supra*, 47 Cal.App.5th at p. 139; accord, *Canizales, supra,* 7 Cal.5th at

pp. 612-613.)  When the trial court instructs the jury on both a factually unsupported theory and a factually supported one, we review the error under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), and the error is harmless if it is not reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error.  (*Canizales*, at pp. 612-613; accord, *Mariscal*, at p. 139.)  However, when the trial court instructs the jury on two legal theories, one of which is legally erroneous, we evaluate whether the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).  (*People v. Aledamat* (2019) 8 Cal.5th 1, 13; *Rayford, supra*, 50 Cal.App.5th at pp. 783-784 [applying *Chapman* harmless error standard to find error in instructing on kill zone was prejudicial].)

The People contend even if the evidence was not sufficient to support the trial court's instruction on the kill zone theory, under *Watson* it is not reasonably probable that absent the error the jury would have reached a result more favorable to Booker and Lewis because the kill zone instruction was not misleading and there was "overwhelming" evidence of defendants' intent to kill Lott.  Booker and Lewis argue the trial court instructed the jury on a legally erroneous theory of the kill zone, and we must therefore consider whether the error in instructing the jury was harmless beyond a reasonable doubt under *Chapman*.  We need not resolve the applicable standard, however, because even under the less stringent *Watson* standard the error was not harmless.

The *Watson* test "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so

27

*relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177; accord, *People v. Beltran* (2013) 56 Cal.4th 935, 956.)

In *Mariscal, supra*, 47 Cal.App.5th at page 133, testimony at trial established the defendant approached a group of five men seated on bleachers at a baseball diamond and asked where they were from. When one of the men responded they were not gang members, the defendant announced his own gang affiliation and shot the man multiple times. The defendant then aimed at the four remaining men and fired on them as they tried to escape, hitting one man in the chest and another in the legs. (*Ibid.*) Two of the men died, and the defendant was convicted of two counts of murder and three counts of attempted murder. (*Id.* at pp. 131, 133.) The Court of Appeal concluded the trial court erred in instructing the jury on the kill zone theory where there was insufficient evidence the defendant had a primary target among the five men, but the error was harmless because "the undisputed evidence is that defendant intended to kill all five young men." (*Id.* at pp. 139-140.) The court reasoned, "The evidence is overwhelming that there was no primary target and that, instead, defendant intended to kill all of the men on the bleachers, or as many as he could." (*Id.* at p. 140.)

Here, unlike in *Mariscal*, evidence Booker and Lewis intended to kill Lott was not "overwhelming." (*Mariscal, supra*, 47 Cal.App.5th at p. 140.) It is possible the jury convicted Booker and Lewis of attempted murder based on direct evidence of their intent to kill Lott, which would be legally permissible. But it is likely the jury relied on the erroneous kill zone instruction in finding defendants intended to kill Lott because she was within a

zone of fatal harm. The evidence Booker and Lewis intended to kill Raya was strong—they saw Raya in the liquor store socializing with a rival gang member who had asked Booker, Lewis, and Weaver where they were from. But there was little if any evidence they intended to kill Lott, who was not near Raya and his friend when the friend asked the men where they were from. Further, the five men left the liquor store before Raya and Lott left the store together. Posey did not see Lott when she entered the liquor store or when Raya and Lott drove past the men in their cars while the men were pulled over on 130th Street. Lott ducked during the shooting, and there was no evidence Booker or Lewis saw her in the car. In light of the entire record, Booker and Lewis have met their burden to show it is reasonably probable they would have achieved a more favorable result had the trial court not instructed on the kill zone theory. (*Watson, supra*, 46 Cal.2d at p. 836.) Accordingly, we reverse Booker's and Lewis's convictions of the attempted murder of Lott[13] and remand for further proceedings consistent with this opinion.[14]

---

[13] Because we conclude the trial court prejudicially erred in instructing the jury on the kill zone theory of concurrent intent, we do not reach Booker's and Lewis's arguments their trial counsel's failures to object to the instruction constituted ineffective assistance of counsel or Lewis's argument he cannot be liable under the kill zone theory as an aider and abettor.

[14] Booker and Lewis do not contend retrial is barred because the evidence was insufficient to support their convictions of the attempted murder of Lott on a theory other than the kill zone. (See *People v. Story* (2009) 45 Cal.4th 1282, 1295 ["'[A]n appellate ruling of legal insufficiency is functionally equivalent to an acquittal and precludes a retrial.'"].)

B.    *Whether Posey, Stone, and Weaver Were Accomplices Was a Disputed Fact for the Jury*\*

Booker and Lewis contend the trial court prejudicially erred in failing to instruct the jury Posey, Stone, and Weaver were accomplices as a matter of law given the three men's undisputed participation in the events leading up to the shooting. They also argue insufficient evidence corroborated Posey's accomplice testimony. Neither contention has merit.

1.    *Jury instructions*

The trial court instructed the jury with CALJIC No. 3.10, "An accomplice is a person who is subject to prosecution for the identical offense charged against the defendant on trial by reason of aiding and abetting." The court also instructed the jury with CALJIC No. 3.14, "Merely assenting to or aiding or assisting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator and without the intent or purpose of committing, encouraging, or facilitating the commission of the crime is not criminal. Thus a person who assents to or aids or assists in the commission of a crime without that knowledge and without that intent or purpose is not an accomplice in the commission of the crime." The court further instructed the jury with CALJIC No. 3.19, "You must determine whether the witness[es] Marcus Posey, Jeremiah Stone, and William Weaver [were] accomplice[s] as I have defined that term. [¶] The defendant has the burden of proving by a preponderance of the evidence that Marcus Posey, Jeremiah Stone, and William Weaver [were] accomplice[s] in the crimes charged against the

---

\*    See footnote, *ante*, page 1.

30

defendant." As to corroboration, the court instructed the jury with CALJIC No. 3.11, "You cannot find a defendant guilty based upon the testimony of an accomplice or the testimony by a codefendant that incriminates the defendant unless that testimony is corroborated by other evidence which tends to connect that defendant with the commission of the offense."

2.    *Applicable law*

Section 1111 provides, "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." Section 1111's definition of accomplice "'"encompasses all principals to the crime [citation], including aiders and abettors and coconspirators."'" (*People v. Anderson* (2018) 5 Cal.5th 372, 410 (*Anderson*), quoting *People v. Manibusan* (2013) 58 Cal.4th 40, 93; accord, *People v. Stankewitz* (1990) 51 Cal.3d 72, 90.)

"'"[A]n accomplice is one who aids or promotes the perpetrator's crime with knowledge of the perpetrator's unlawful purpose *and* an intent to assist in the commission of the target crime . . . ." [Citation.] "In order to be an accomplice, the witness must be chargeable with the crime as a principal (§ 31) and not merely as an accessory after the fact (§§ 32, 33)."'" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 429 (*Bryant, Smith and Wheeler*); accord, *People v. Manibusan, supra*, 58 Cal.4th at p. 93.) "'Whether someone is an accomplice is

31

ordinarily a question of fact for the jury; only if there is no reasonable dispute as to the facts or the inferences to be drawn from the facts may a trial court instruct a jury that a witness is an accomplice as a matter of law.'" (*Bryant, Smith and Wheeler*, at p. 430; accord, *Anderson, supra*, 5 Cal.5th at p. 410.) Before instructing the jury a witness is an accomplice as a matter of law, the trial court's task is "not to determine whether the jury *could* reasonably find [the witness] was an accomplice, but rather whether it could *only* reasonably find that he was an accomplice." (*Bryant, Smith and Wheeler*, at p. 430 [whether witness who followed defendants' directions immediately before shooting was an accomplice was a question for the jury where the witness testified he followed defendants' orders but did not know what was going to happen]; accord, *Anderson*, at pp. 410-411 [whether witnesses who observed conspirators discuss, plan, and prepare for burglary were accomplices was properly a matter for the jury].)

3.  *The trial court did not err in failing to instruct the jury Posey, Stone, and Weaver were accomplices as a matter of law*

Certainly a reasonable juror could have concluded Posey, Stone, and Weaver aided and abetted the crimes committed by Booker and Lewis based on the evidence they traveled in a procession of fellow Poccet Hood gang members to the liquor store located on the border of rival Largo territory; they entered then exited the store together; they followed in a procession to 130th Street and pulled over while Booker and Lewis swapped places; and they trailed Booker's car as it followed after Lott's. Each was present in the liquor store when Raya's friend, a Largo member,

asked where they were from. And they all drove off after Booker fired into Lott's car.

But a reasonable juror could alternatively have reasonably concluded Posey, Stone, and Weaver did not know Booker and Lewis planned to shoot into Lott's car and did not share their intent to do so. Similar to the witness in *Bryant, Smith and Wheeler, supra*, 60 Cal.4th at page 430, Posey denied planning or discussing the shooting with anyone in advance, and he denied knowing anyone had a gun that evening. Posey stated the manner of the shooting—a procession of cars following the shooter's vehicle—was not typical of a gang "mission" because "[t]hat's just nothing but a lot of people watching you." Weaver and Stone also denied involvement in the shooting during their interviews with Detective Woodruff. Moreover, it could reasonably be inferred from Posey's testimony—that the men did not discuss a plan and would not typically carry out a "mission" in this manner—that Weaver and Stone likewise did not know or share Booker's and Lewis's intent. On this record, the trial court did not err in determining the inference that Posey, Stone, and Weaver were accomplices was not the only reasonable inference. (*Anderson, supra*, 5 Cal.5th at pp. 410-411; *Bryant, Smith and Wheeler*, at p. 430.)[15]

---

[15] Booker also argues Posey, Stone, and Weaver were accomplices as a matter of law because they were charged with the same counts in the information, even though the trial court dismissed all the charges against them pursuant to section 995. But Booker cites no authority for this proposition, nor is it the law. (See *Bryant, Smith and Wheeler, supra*, 60 Cal.4th at p. 432 ["the fact that [a witness] was initially charged in the case is not dispositive" of whether the witness is an accomplice as a matter

33

4.     *We do not decide whether there was sufficient corroboration of Posey, Stone, and Weaver's testimony because the jury could reasonably have found they were not accomplices*

Booker and Lewis contend there was insufficient evidence to corroborate Posey, Stone, and Weaver's testimony.  But as discussed, the trial court did not err in declining to instruct the jury that the three were accomplices as a matter of law.  Only if a witness is an accomplice as a matter of law do we review whether corroborating evidence was sufficient to support the accomplice's testimony under section 1111.  (*People v. Dalton* (2019) 7 Cal.5th 166, 245 ["Evidence corroborating [a witness]'s testimony was required for each count as to which [witness] was an accomplice as a matter of law."]; *Bryant, Smith and Wheeler, supra,* 60 Cal.4th at p. 432 ["Because the jurors reasonably could have found [the witness] was *not* an accomplice, we need not, and do not, decide whether there was sufficient corroborating evidence as to each defendant."].)  Because the jury could reasonably have concluded that Posey, Stone, and Weaver were not accomplices, we do not reach whether there was substantial evidence to corroborate their testimony.[16]

_____

of law]; *People v. Johnson* (2016) 243 Cal.App.4th 1247, 1271 [trial court erred in instructing that codefendants were accomplices as a matter of law where each testified he was not guilty of the crimes charged, but the error was harmless because it was not reasonably probable the jury would have found either defendant was not an accomplice].)

[16]     Because we reject Lewis's argument there was insufficient evidence of corroboration, we likewise reject his claim the trial

34

C. *The Trial Court Did Not Err in Instructing the Jury with CALJIC No. 3.18*

The court instructed the jury with CALJIC No. 3.18, as modified, "To the extent that an accomplice or a codefendant gives testimony that tends to incriminate the defendant, it should be viewed with caution. This does not mean, however, that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in light of all the evidence in this case."

Lewis contends the trial court erred by failing to modify CALJIC No. 3.18 to instruct the jury to evaluate the portions of Lewis's testimony that supported Lewis's defense under the general rules of witness credibility, rather than with the caution applicable to a codefendant's statements that tend to incriminate a defendant. This contention lacks merit.

The Supreme Court in *People v. Guiuan* (1998) 18 Cal.4th 558, 569 (*Guiuan*) specifically approved the instructional language used by the trial court here requiring accomplice testimony be treated with caution where the testimony tends to incriminate a defendant, explaining "the trial court should not be required to parse the testimony of an accomplice to determine whether it may be construed as 'favorable' or 'unfavorable' to the

court erred in denying his motion to dismiss under section 1118.1. (See *People v. Boyce* (1980) 110 Cal.App.3d 726, 736 [trial court correctly denied motion for acquittal under § 1118.1 where "it could not be determined . . . whether corroboration was required because a jury question remained" whether witness was an accomplice].)

defendant." (Accord, *People v. Bacon* (2010) 50 Cal.4th 1082, 1111 ["The standard cautionary instruction on accomplice testimony, CALJIC No. 3.18 . . . reflects the language of the majority opinion in *Guiuan* . . . ."].)

Lewis argues the language approved in *Guiuan* and used here should be modified where a defendant provides testimony in his defense that also incriminates a codefendant to make clear the exculpatory portion of the defendant's testimony should be evaluated using the general rules of credibility. The Supreme Court rejected this argument in *People v. Alvarez* (1996) 14 Cal.4th 155, 218 (*Alvarez*), in which the defendant, as here, testified and denied guilt but incriminated his codefendant. The *Alvarez* court explained, "[T]he testimony of an accomplice-defendant that tends to incriminate his codefendant should be viewed with distrust. [The instruction's] limitation—the accomplice-defendant's testimony should be viewed with distrust *to the extent that it tends to incriminate his codefendant*—was altogether proper." (*Ibid*; see *Guiuan, supra*, 18 Cal.4th at p. 569, fn. 4 ["The word 'caution,' connoting 'care and watchfulness,' signals the need for the jury to pay special heed to *incriminating* testimony because it may be biased, but avoids the suggestion that *all* of the accomplice's testimony, including favorable testimony, is untrustworthy."]; *People v. Johnson* (2016) 243 Cal.App.4th 1247, 1274 [concluding as to testimony of codefendant-accomplice that was part exculpatory, "Because the accomplice testimony instructions expressly single out 'incriminating' testimony to be viewed with care and caution, they do not suggest the jury must apply this standard to *all* testimony given by an accomplice"].)

Lewis's reliance on *People v. Coffman and Marlow* (2004) 34 Cal.4th 1 is misplaced. There, two codefendants testified at

36

trial, and each sought to blame the other for the offenses. (*Id.* at p. 104.) The trial court instructed the jury to apply the general rules of credibility when weighing each defendant's testimony in his or her own defense, but if it found the defendant was an accomplice, it should view the testimony against the codefendant with distrust. (*Ibid.*) The Supreme Court rejected the argument the instruction would be confusing for the jury, but it did not hold trial courts must modify the accomplice instruction as to the exculpatory portion of a defendant's testimony. (*Id.* at pp. 104-105.)[17]

Here, consistent with *Guiuan* and *Alvarez*, the trial court instructed the jury with CALJIC No. 3.18 regarding how to assess the portions of Lewis's testimony that incriminated Booker, as well as CALJIC No. 2.20, which explained how generally to assess witness testimony. We presume the jurors followed the instructions that were given. (*People v. Covarrubias, supra*, 1 Cal.5th at p. 915.)

---

[17] *People v. Fowler* (1987) 196 Cal.App.3d 79, relied on by Lewis, predates the Supreme Court's decision in *Guiuan* and is not controlling. Further, the trial court in *Fowler* instructed the jury "'[t]he testimony of an accomplice which tends to incriminate the other in the offense for which they are on trial should be viewed with distrust.'" (*Id.* at p. 85.) As discussed, the Supreme Court in *Guiuan, supra*, 18 Cal.4th at page 569 concluded "that the phrase 'care and caution' better articulates the proper approach to be taken by the jury," instead of the "'with distrust'" language used in *Fowler*, at page 85.

D.	*The Trial Court Did Not Abuse Its Discretion in Declining To Hold a Hearing Regarding Juror Intimidation*

1.	*Proceedings below*

On December 21, 2018, following the People's case in rebuttal, Lewis's attorney addressed the court, "Your Honor, there's one other issue. Yesterday my fiancé[e] came to observe the proceedings. And she was seated in the back row by the door. And when the jurors were returning from the three o'clock break, she heard Juror No. 2 say to Juror No. 8, quote, 'Don't let them intimidate you.' And Juror No. 8 replied with, 'I'm not going to let them intimidate me. I've got Jesus.'" Lewis's attorney noted his fiancée was an attorney and available to explain what she saw, and he requested the court inquire of the two jurors as to the meaning of the statements. The trial court responded, "Let's assume it's in reference to the plethora of people we have on my right in the corner. Then it's still not a discussion about the facts of this case. It is not then presumed misconduct. Thus I will not inquire."

Booker's attorney joined Lewis's request, stating, "Your Honor, it would be relevant if somebody feels they're being intimidated in some way or another. . . . If someone's being intimidated, that's relevant to how they may act as a juror." Booker's attorney added, "I expect, if we ask them . . . . And Juror No. 8 is going to say, 'Yeah, I had to tell them I had to go on vacation on the 21st.'[18] And the other one's saying, 'Don't let them intimidate you.' I got a feeling that's what it is. . . . I think, when intimidation is used by anything but a juror, we need to know what that is." The court responded, "Again, I understand

---

[18]	The record suggests Juror No. 8 requested to be excused during voir dire due to a planned vacation.

what you're saying.  I'm not going to inquire based upon what I heard."

When the jury returned, the court inquired of Juror No. 8 whether continuing to sit as a juror would interfere with her vacation plans if jury deliberations continued through December 26.  Juror No. 8 responded, "I want to move forward with my vacation."  With the stipulation of all counsel, the trial court excused Juror No. 8.  Juror No. 2 remained on the panel.

After the jury returned its verdict, Lewis filed a motion for a new trial, arguing "possible juror misconduct compromised [his] right to a fair and impartial trial."  The trial court denied the motion.

2.      *Applicable law and standard of review*

"'[W]hen a court is put "on notice that improper or external influences were being brought to bear on a juror . . . 'it is the court's duty to make whatever inquiry is reasonably necessary to determine if the juror should be discharged and whether the impartiality of the other jurors has been affected.'"  [Citation.] Such an inquiry is central to maintaining the integrity of the jury system, and therefore is central to the criminal defendant's right to a fair trial.'"  (*People v. Fuiava* (2012) 53 Cal.4th 622, 702 (*Fuiava*); accord, *People v. Martinez* (2010) 47 Cal.4th 911, 941 ["'"[O]nce a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged."'"]; see § 1089 [authorizing the trial court to discharge and replace a seated juror if "a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty"].)

However, "'[n]ot every incident involving a juror's conduct requires or warrants further investigation.'" (*People v. Sánchez* (2016) 63 Cal.4th 411, 459; accord, *Fuiava, supra*, 53 Cal.4th at pp. 701-702.) "'"The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial.'" [Citation.] A hearing is required only where the court possesses information which, if proved to be true, would constitute "good cause" to doubt a juror's ability to perform his or her duties and would justify his or her removal from the case.'" (*People v. Williams* (2013) 58 Cal.4th 197, 290 ["spectator's assertion that Juror No. 6 had been 'nodding off' was insufficient to apprise the trial court that good cause might exist to discharge him"]; accord, *Sánchez*, at pp. 457-459 [trial court did not abuse its discretion in failing to inquire about juror who "'made a very adamant up and down motion with her head'" in response to certain trial testimony]; *People v. Martinez, supra*, 47 Cal.4th at pp. 940-942 [trial court did not err in declining to hold a hearing regarding juror's communications with prosecutor's investigator about defendant's juvenile criminal record, during which juror asked investigator to "'get her off the jury,'" where contact was inadvertent result of juror's employment as clerk at juvenile hall]; *People v. Kaurish* (1990) 52 Cal.3d 648, 694 [trial court did not abuse its discretion in declining to inquire as to unidentified juror's derogatory remark at the end of defendant's case to defense counsel, "'Oh, you son-of-a-'"].)

3. *The trial court did not abuse its discretion in declining to inquire of the jury regarding intimidation*

Booker and Lewis argue the trial court's failure to inquire of Juror Nos. 2 and 8 as to possible intimidation violated their right to an impartial jury. This contention lacks merit.

A sitting juror's exposure to attempts by jurors or nonjurors to tamper with the jury by intimidation may constitute good cause for dismissal. (*In re Hamilton* (1999) 20 Cal.4th 273, 294-295 ["A sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require similar examination for probable prejudice. Such situations may include attempts by nonjurors to tamper with the jury, as by bribery or intimidation."].) But here, the trial court did not possess information showing an attempt to intimidate Juror No. 8 in her role as a juror because the information provided to the court did not show the asserted intimidation had any relation to the substance of the trial. Further, Juror No. 2 counseled Juror No. 8 not to be intimidated, and Juror No. 8 indicated she would not be. In addition, Juror No. 8 was excused from service due to her planned vacation immediately after the statements were brought to the court's attention, and there was no evidence any other jurors had been intimidated.

*Fuiava, supra*, 53 Cal.4th at pages 701 to 702 is directly on point. There, a juror reported seeing two courtroom spectators she associated with the defendant point at and appear to discuss some of the jurors. The juror stated the incident caused her to experience nausea, migraines, and inability to sleep due to stress, although she did not perceive the spectators as threatening. The juror added that she heard other jurors discussing the incident as they were leaving the courthouse the prior evening. The trial court dismissed the juror without investigating whether the

41

remaining jurors had witnessed similar conduct by the spectators. (*Id.* at p. 701.) The Supreme Court rejected the defendant's contention on appeal the trial court breached its sua sponte duty to inquire of the remaining jurors. (*Id.* at p. 702.) The *Fuiava* court reasoned the trial court had not observed inappropriate behavior by spectators, and even if there had been inappropriate gestures, "these circumstances did not suggest that other jurors were similarly upset to the extent that they, too, might not have been able to perform their duties as jurors." (*Ibid.*)

Here, as in *Fuiava*, the court did not itself witness any acts of juror intimidation. Additionally, there were no circumstances suggesting any jurors (including Juror No. 2) were upset or otherwise affected by possible intimidation. Although Booker is correct *Fuiava* is distinguishable in that defense counsel there did not request a further inquiry into the spectators' conduct, that difference does not alter our conclusion. As the *Fuiava* court observed, "Adopting defendant's position would, in essence, mandate that the trial court conduct an inquiry whenever it becomes aware of any indication of a possibility that there might be good cause to remove a juror. That is not the law." (*Fuiava, supra*, 53 Cal.4th at p. 703.)

Booker's and Lewis's reliance on *People v. Burgener* (1986) 41 Cal.3d 505, 520-521, disapproved on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 756, is misplaced. There, the Supreme Court concluded the trial court abused its discretion in failing to conduct a further inquiry after the jury foreperson informed the trial court in camera that a juror was intoxicated and four other jurors had told the foreperson the same juror smelled like marijuana. (*Burgener*, at pp. 520-521.) The *Burgener* court explained, "[T]he foreman's statements were

42

sufficient to raise the possibility [the juror] was intoxicated during jury deliberations.  If, due to the use of intoxicating substances, [the juror]'s ability to follow the instructions of the court, to deliberate, to render a verdict or otherwise discharge her duties was compromised, she ought to have been excused." (*Id.* at p. 520.)  Unlike in *Burgener*, where there was direct evidence a juror may have been impaired during jury deliberations, here there is no indication Juror Nos. 2 and 8—or any other jurors— were intimidated with respect to the proceedings.

E.      *Booker Has Not Shown Ineffective Assistance of Counsel Based on His Attorney's Failure To Object to Admission of His 2008 Felony Burglary Conviction*

Booker asserts his trial attorney provided ineffective assistance of counsel by failing to object under Evidence Code section 352[19] to admission of evidence of Booker's prior felony conviction to establish a pattern of criminal activity by Poccet Hood gang members, and by failing to request a limiting instruction for the jury on its use of the conviction.  His contention lacks merit.

1.      *Proceedings below*

At trial, the People introduced evidence of the prior convictions of four Poccet Hood members: Dan Young (2018

---

[19]      Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

43

conviction of multiple counts of murder, attempted murder, and other crimes), Christopher Stone (2018 conviction of murder and attempted murder), Lewis (2008 conviction of robbery), and Booker (2008 conviction of felony burglary). Booker's attorney did not object to the admission of Booker's prior conviction and did not request the trial court give an instruction limiting the purposes for which the jury could consider Booker's 2008 conviction.

2. *Governing law on ineffective assistance of counsel*

""""To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant."""" (*People v. Rices* (2017) 4 Cal.5th 49, 80; accord, *People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*); see *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.)

"On direct appeal, if the record "'sheds no light on why counsel acted or failed to act in the manner challenged,'" we must reject the claim "'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'""" (*People v. Caro* (2019) 7 Cal.5th 463, 488 (*Caro*); accord, *Mickel, supra*, 2 Cal.5th at p. 198 ["[A] reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""no rational tactical purpose"" for an action or omission."]; see *People v. Lopez* (2008) 42 Cal.4th 960, 972 ["[E]xcept in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of

44

ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal."].)

We presume "that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.'" (*Mickel, supra*, 2 Cal.5th at p. 198; accord, *People v. Bell* (2019) 7 Cal.5th 70, 125 ["'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy."'"].)

"[T]he decision to object or not object to the admission of evidence is inherently tactical, and a failure to object will seldom establish ineffective assistance." (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1092; accord, *Caro, supra*, 7 Cal.5th at p. 514 ["The failure to object only rarely constitutes ineffective representation."]; *People v. Lopez, supra*, 42 Cal.4th at p. 972 ["'[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.'"].)

3.      *Booker has not shown ineffective assistance of counsel*

Section 186.22, subdivision (b)(1), provides for a sentence enhancement for felonies "committed for the benefit of, at the direction of, or in association with any criminal street gang."  A criminal street gang, in turn, "is any ongoing association that has as one of its primary activities the commission of certain criminal offenses and engages through its members in a 'pattern of criminal gang activity.'  (§ 186.22, subd. (f); [citation].)  A pattern of criminal gang activity is 'the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more' specified criminal offenses within a certain time frame, 'on separate

45

occasions, or by two or more persons' (the 'predicate offenses')."
(*People v. Tran* (2011) 51 Cal.4th 1040, 1044 (*Tran*); accord,
*People v. Prunty* (2015) 62 Cal.4th 59, 67; see § 186.22, subd. (e)
[requiring proof of two or more predicate offenses on separate
occasions or by two or more persons].)

"[A] predicate offense may be established by evidence of an
offense the defendant committed on a separate occasion.
Further, that the prosecution may have the ability to develop
evidence of predicate offenses committed by other gang members
does not require exclusion of evidence of a defendant's own
separate offense to show a pattern of criminal gang activity."
(*Tran, supra*, 51 Cal.4th at p. 1044.)  Under Evidence Code
section 352 the trial court may exclude evidence where the
probative value is substantially outweighed by its prejudicial
effect.  But as the Supreme Court explained in *Tran*, "[B]ecause
the prosecution is required to establish the defendant was an
active participant in a criminal street gang and had knowledge of
the gang's criminal activities, the jury inevitably and necessarily
will in any event receive evidence tending to show the defendant
actively supported the street gang's criminal activities.  That the
defendant was personally involved in some of those activities
typically will not so increase the prejudicial nature of the
evidence as to unfairly bias the jury against the defendant.  In
short, the use of evidence of a defendant's separate offense to
prove a predicate offense should not generally create 'an
intolerable "risk to the fairness of the proceedings or the
reliability of the outcome."'"  (*Tran*, at p. 1048.)

It is not reasonably probable the trial court would have
sustained Booker's objection under Evidence Code section 352 to
admission of his 2008 conviction for felony burglary, an offense
decidedly less serious than those in the present case.  (See *Tran,*

46

*supra*, 51 Cal.4th at p. 1047.)  Booker's contention the prosecution could have relied on the two convictions of Poccet Hood gang members not on trial is not persuasive.  To the contrary, "the court need not limit the prosecution's evidence to one or two separate offenses lest the jury find a failure of proof as to at least one of them . . . ."  (*Id*. at p. 1049.)

Moreover, Booker has not shown a reasonable probability he would not have been convicted if the trial court had excluded the evidence of his 2008 conviction.  As discussed, the evidence Booker shot and killed Raya was strong.  Booker was present at the liquor store immediately before the killing.  He was arrested driving a white car with tinted windows, fitting Lott's description of the shooter's vehicle.  And Posey identified Booker as the shooter.

Booker's argument his attorney provided ineffective assistance of counsel by failing to request a limiting instruction as to the jury's use of the prior conviction also fails.  Booker was entitled to a limiting instruction at his request.  (Evid. Code, § 355 ["When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly."].)  But the record does not reveal why Booker's attorney did not request a limiting instruction on the jury's consideration of Booker's prior conviction.  The decision not to object may reasonably have been a strategic decision by Booker's attorney to avoid drawing unnecessary attention to Booker's prior conviction.  (See *People v. Griggs* (2003) 110 Cal.App.4th 1137, 1141 ["[W]hether to seek a limiting instruction is a tactical decision properly left to defense counsel, since defense counsel might conclude that the risk of a limiting instruction (unnecessarily highlighting a defendant's status as a felon)

47

outweighed the questionable benefits such an instruction would provide."].)  Affording great deference to defense counsel, we cannot say Booker's attorney had no rational tactical purpose for his failure to object to the evidence.  (*Mickel, supra*, 2 Cal.5th at p. 198; *Caro, supra*, 7 Cal.5th at p. 514.)

F.     *The Record Does Not Support Remand for Resentencing Pursuant to Section 12022.53, Subdivision (h)*

Booker and Lewis contend remand is necessary to permit the trial court to exercise its discretion whether to strike the greater of the firearm enhancements imposed as part of their sentences (§ 12022.53, subd. (d)) and instead to impose a lesser enhancement (*id.*, subd. (b) or (c)).  Their contention lacks merit because, on the record here, the trial court was aware it had the sentencing authority under section 12022.53, subdivision (h), to strike or dismiss the firearm enhancements, but clearly indicated it would not exercise its discretion.

At sentencing, the trial court stated as to Booker on count 1, "I'm aware of my discretion to strike the [section] 12022.53[,] subdivision (d) allegation pursuant to [section] 12022.53[,] subdivision (h) and I am not striking that allegation based upon the facts of the case as well as the prior convictions in this matter."  As to count 2, the court stated, "I am aware of my discretion to strike the enhancement pursuant to [section] 12022.53[,] subdivision (h), and, again, I'm choosing not to strike those allegations based upon the reasons I gave previously."  As to Lewis on count 1, the trial court similarly stated, "Pursuant to . . . section 12022.53[,] subdivision (h), again, I am aware of my discretion . . . .  I'm choosing not to exercise my discretion . . . based upon the circumstances of this crime as well as the prior convictions of this defendant."  As to count 2, the court stated,

"[P]ursuant to . . . section 12022.53[,] subdivision (h) . . . the court will not dismiss those and exercise my discretion . . . ." Although the court in imposing and staying the additional firearm enhancements under section 12022.53, subdivisions (b) and (c), did not explicitly state it was aware of its discretion to impose one of those enhancements in lieu of imposition of the greater enhancement, there is nothing in the record to suggest the court was not aware of its clear authority under section 12022.53, subdivision (h), to do so.[20]

People v. Morrison (2019) 34 Cal.App.5th 217 (Morrison), relied on by Booker and Lewis, is distinguishable. There, the jury found true that the defendant personally discharged a firearm causing death (§ 12022.53, subd. (d)), but no lesser firearm enhancement under subdivision (b) or (c) was alleged or presented to the jury. (Morrison, at p. 221.) The Court of Appeal concluded the trial court had discretion to impose an unalleged lesser enhancement under section 12022.53, subdivision (b) or (c), after striking the greater firearm enhancement (§ 12022.53, subd. (d)). (Morrison, at p. 222; but see People v. Garcia (2020) 46 Cal.App.5th 786, 790-791, review granted June 10, 2020, S261772 (Garcia) ["[S]ection 12022.53, subdivision (h) does not grant a trial court the discretion to substitute lesser included enhancements, at least where the greater enhancement is legally and factually valid."]; People v. Tirado (2019) 38 Cal.App.5th 637, 643, review granted November 13, 2019, S257658 (Tirado) ["Nothing in the plain language of sections 1385 and 12022.53,

---

[20]     As to both Booker and Lewis, the court also expressly declined to exercise its discretion to strike or dismiss the prior serious felony enhancement under section 667, subdivision (a)(1).

subdivision (h) authorizes a trial court to substitute one enhancement for another."].)

*Morrison* is inapposite because, as the court there observed, "The question of whether the court may elect to impose uncharged lesser firearm enhancements as part of its discretion under . . . the amended version of section 12022.53, subdivision (h) only arises in cases where those enhancements have not been charged in the alternative and found true . . . ." (*Morrison, supra,* 34 Cal.App.5th at pp. 224-225.)  This is not such a case.

Here, the information alleged Booker and Lewis violated section 12022.53, subdivisions (b), (c), and (d).  The jury found true each special allegation.  Thus, even before the decision in *Morrison,* the trial court had discretion under section 12022.53, subdivision (h), to strike or dismiss any or all of the enhancements under section 1385.  Although the court only specifically discussed its discretion to strike the greater enhancement under section 12022.53, subdivision (d), there is nothing in the record to suggest the court was not aware of its discretion to strike the greater enhancement but impose the lesser enhancement, nor does the record suggest the court would have done so given its repeated references to the serious nature of the crimes and defendants' prior convictions.

G.    *There Is No Cumulative Error*

Booker and Lewis contend that even if no single error warrants reversal, the cumulative effect of the trial court's errors requires reversal.  "'Under the cumulative error doctrine, the reviewing court must "review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence."'" (*People v. Mireles* (2018) 21 Cal.App.5th 237,

50

249; accord, *People v. Cunningham* (2001) 25 Cal.4th 926, 1009 ["'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'"].)  Because there was no error (other than as to the attempted murder convictions, which we reverse), there was no cumulative error.

H.    *The Abstract of Lewis's Judgment Must Accurately Reflect His Sentence*

On count 1 for the first degree murder of Raya, the trial court imposed on Lewis a sentence of 25 years to life for the firearm enhancement under section 12022.53, subdivisions (d) and (e)(1).  On count 3 for shooting at an occupied vehicle, the trial court imposed but stayed a sentence of 25 years to life also under section 12022.53, subdivisions (d) and (e)(1).  However, the abstract of judgment shows the trial court stayed imposition of the sentence on the firearm enhancement as to count 1, but not as to count 3.  When the new abstract of judgment is prepared, it must conform to the sentence orally pronounced by the trial court.[21]

---

[21]    The abstract of judgment for Lewis also fails to reflect the trial court stayed on count 1 the firearm enhancement under section 12022.53, subdivisions (b) and (e)(1).  The abstract of judgment for Booker likewise does not reflect the trial court imposed and stayed as to counts 1 and 2 the firearm enhancements under section 12022.53, subdivisions (c) and (e)(1).

## DISPOSITION

We reverse Booker's and Lewis's convictions of attempted murder and remand for further proceedings consistent with this opinion.  In all other respects, the convictions are affirmed.


FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.